Michigan Supreme Court
Lansing, Michigan

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 15, 2004**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                 No. 122364

GLENN GOLDSTON,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

In this case, we must determine whether to recognize a "good-faith" exception to the exclusionary rule. In *United States v Leon*, 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1984), the United States Supreme Court interpreted US Const, Am IV and adopted a good-faith exception to the exclusionary rule as a remedy for unreasonable searches and seizures. Under *Leon*, the exclusionary rule does not bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant ultimately found to have been defective. The exclusionary rule in Michigan is a judicially created remedy that is not based on the text of

our constitutional search and seizure provision, Const 1963, art 1, § 11. Indeed, records of the 1961 Constitutional Convention evidence an intent on behalf of the people of Michigan to retreat from the judge-made exclusionary rule consistent with the United States Supreme Court's interpretation of the Fourth Amendment in *Leon*. We therefore adopt the good-faith exception to the exclusionary rule in Michigan. The purpose of the exclusionary rule is to deter police misconduct. That purpose would not be furthered by excluding evidence that the police recovered in objective, good-faith reliance on a search warrant. We thus reverse the circuit court's ruling suppressing the evidence seized pursuant to the defective warrant in this case.

## I. UNDERLYING FACTS AND PROCEDURAL HISTORY

On September 23, 2001, twelve days after the terrorist attacks of September 11, 2001, police officers observed defendant collecting money on a street corner. He was wearing a shirt with the word "Fireman" written on it and holding a fireman's boot. He also carried a firefighter's helmet and jacket. Defendant told a police officer that he was collecting money for the firefighters in New York, but denied being a firefighter himself. The officers

confiscated $238 from defendant along with the firefighter paraphernalia, but did not immediately arrest him.

Thereafter, the officers successfully sought a search warrant for defendant's home. The warrant listed the address as "29440 Hazelwood, Inkster" and authorized the police to seize the following items:

> Police/Fire scanner(s) or radios, fire, EMS, Police equipment. Any and all emergency equipment, bank accounts, currency, donation type cans or containers, any and all other illegal contraband.

The search uncovered more firefighter paraphernalia, a firearm, and marijuana. The prosecutor charged defendant with being a felon in possession of a firearm, MCL 750.224f; possession of a firearm during the attempt or commission of a felony, MCL 750.227b; two counts of possession of marijuana, MCL 333.7403(2)(d); and larceny by false pretenses, MCL 750.218.

Defendant filed a motion to suppress evidence, asserting both federal and state grounds, US Const, Am IV; Const 1963, art 1, § 11, which the circuit court granted. The court ruled that the search warrant affidavit did not connect the place to be searched with defendant and did not state the date that the police observed defendant soliciting money. The court thus concluded that the affidavit did not establish probable cause for the issuance

of a warrant and dismissed the felon in possession, felony-firearm, and marijuana possession charges.[1]

The Court of Appeals denied the prosecutor's delayed application for leave to appeal. Thereafter, we granted leave to appeal, limited to the issue whether this Court should adopt a good-faith exception to the exclusionary rule.[2]

## II. STANDARD OF REVIEW

Whether Michigan should recognize a good-faith exception to the exclusionary rule is a question of law that this Court reviews de novo. *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003).

## III. ANALYSIS

### A. The federal good-faith exception

In *Weeks v United States*, 232 US 383; 34 S Ct 341; 58 L Ed 2d 652 (1914), the United States Supreme Court held that, in a federal prosecution, the Fourth Amendment barred the use of evidence obtained pursuant to an illegal search or seizure. The Court reasoned:

> If letters and private documents can thus be [illegally] seized and held and used in evidence

---

[1] The court did not dismiss the misdemeanor charge of larceny by false pretenses.

[2] 467 Mich 939 (2003).

4

against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. [*Id*. at 393.]

In *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), the United States Supreme Court extended the *Weeks* exclusionary rule to the states. The Court reasoned that because the Fourth Amendment right is enforceable against the states by virtue of the Due Process Clause of the Fourteenth Amendment, the same sanction, i.e., the exclusion of illegally obtained evidence, must apply to state prosecutions as well as to federal prosecutions. *Id*. at 655, 660.

In *Leon,* the Supreme Court adopted a good-faith exception to the exclusionary rule. In that case, the Court rejected the notion that "the exclusionary rule is a necessary corollary of the Fourth Amendment." *Leon, supra* at 905-906. The Court stated that the exclusionary rule is not derived from the text of the Fourth Amendment:

> The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "[works] no new Fourth Amendment wrong." *United States v Calandra*, 414 US 338, 354 [94 S Ct 613; 38 L Ed 2d 561] (1974). The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure

itself, *ibid.*, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." *Stone v Powell*, [428 US 465, 540; 96 S Ct 3037; 49 L Ed 2d 1067 (1976)] (WHITE, J., dissenting). The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v Calandra, supra* at 348. [*Id*. at 906.]

The Court clarified that whether the exclusion of evidence is an appropriate sanction in a particular case is a separate issue from whether police misconduct violated a person's Fourth Amendment rights. The Court further stated that whether invocation of the "judicially created remedy" is appropriate involves weighing the costs and benefits in each particular case. *Id*. at 906-907. The primary benefit of the exclusionary rule is that it deters official misconduct by removing incentives to engage in unreasonable searches and seizures. The costs, however, include preventing the use in the prosecutor's case-in-chief of trustworthy evidence obtained in reliance on a search warrant subsequently found to be defective. *Id*.

The Court expressed concern that rigid adherence to the exclusionary rule, particularly when law enforcement officers act in good faith or when their transgressions are minor, "offends basic concepts of the criminal justice

6

system" and breeds contempt for the law and the administration of justice. *Id*. at 907-908. Thus, the Court recognized the potential for the exclusionary rule to impede the truth-seeking function of the judiciary, resulting in guilty parties either evading punishment altogether or receiving favorable plea bargains. The Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id*. at 922.

Central to the Court's reasoning was the exclusionary rule's purpose of deterring police misconduct. The Court opined that no deterrence occurs when police reasonably rely on a warrant later found to be deficient. *Id*. at 916-919.

> In short, where the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." [*Id*. at 919-920, quoting *Stone, supra* at 539-540 (White, J., dissenting).]

The Court stated that this is particularly true when a law enforcement officer acts within the scope of, and in

objective, good-faith reliance on, a search warrant obtained from a judge or magistrate. Excluding the evidence recovered in such cases would have no deterrent effect on the officer. *Id*. at 920-921.

The Court rejected the notion that a purpose of the exclusionary rule is to rectify the errors of judges and magistrates. It stated that no evidence exists that judges and magistrates are inclined to ignore the Fourth Amendment or that the extreme sanction of exclusion is necessary for "lawlessness" among judges and magistrates. *Id*. at 916. The Court could discern no basis for believing that exclusion of evidence would have a significant deterrent effect on an issuing judge or magistrate because they are not "adjuncts to the law enforcement team." *Id*. at 917.

The Court concluded that the exclusionary rule should be employed on a case-by-case basis and only where exclusion would further the purpose of deterring police misconduct. The Court emphasized, however, that a police officer's reliance on a magistrate's probable cause determination and on the technical sufficiency of a warrant must be objectively reasonable. Evidence should also be suppressed if the issuing magistrate or judge is misled by information in the affidavit that the affiant either knew was false or would have known was false except for his

reckless disregard of the truth.  Further, the Court stated that the good-faith exception does not apply where the magistrate wholly abandons his judicial role or where an officer relies on a warrant based on an affidavit "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[3]  *Id*. at 923, quoting *Brown v Illinois*, 422 US 590, 610; 95 S Ct 2254; 45 L Ed 2d 416 (1975) (Powell, J., concurring in part).

### B. The exclusionary rule in Michigan

Five years after the United States Supreme Court issued its opinion in *Weeks*, this Court decided *People v Marxhausen*, 204 Mich 559; 171 NW 557 (1919).  In *Marxhausen,* this Court examined the language of Michigan's then-existing search and seizure provision, Const 1908, art 2, § 10:

> The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures.  No warrant to search any place or to seize any person or things shall

---

[3] In *Arizona v Evans*, 514 US 1, 14-16; 115 S Ct 1185; 131 L Ed 2d 34 (1995), the Supreme Court followed *Leon* and held that a court employee's clerical error did not warrant the exclusion of evidence.  Such a remedy would not have deterred future errors by court personnel or the behavior of the arresting officer who reasonably relied on the erroneous computer record.

issue without describing them, nor without probable cause, supported by oath or affirmation.

This Court stated that the above provision was "in effect the same provision found in the Fourth Amendment to the Federal Constitution."[4] *Marxhausen, supra* at 562. This Court then reviewed federal case law, including *Weeks*, and concluded that Michigan would follow the federal exclusionary rule. *Id*. at 568-574. Thus, long before the *Mapp* Court required the states to follow the *Weeks* exclusionary rule, this Court elected to follow the exclusionary rule in Michigan. This Court did not, however, base its decision on the language of the Michigan Constitution. In fact, nowhere in *Marxhausen* did this Court opine that *the language of our Constitution* required the exclusion of evidence seized in violation of our constitutional provisions. Rather, the *Marxhausen* Court followed the exclusionary rule as a matter of policy

---

[4] **US Const, Am IV provides:**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

preference in favor of the federal law.[5]  Thus, similar to the *Weeks* exclusionary rule, our exclusionary rule in Michigan is purely a common-law, judge-made rule.

Notwithstanding the *Leon* Court's adoption of the federal good-faith exception to the exclusionary rule, to date, this Court has not recognized a similar state exception.  The United States Supreme Court has stated,

---

[5] In this vein, the *Marxhausen* Court stated:

An examination of many cases decided by the United States Supreme Court involving both the Fourth and Fifth Amendments satisfies us that the rule announced by that court will be reached by careful consideration of three cases decided by that court, and only three; that by a careful consideration of these three cases we will be able to clearly understand the rule laid down by that, the court of last resort of the nation, and the reason for the rule.  These cases are *Boyd v United States*, 116 US 616 (6 Sup Ct 524 [29 L Ed 746 (1886)]); *Adams v New York*, 192 US 585 (24 Sup Ct 372 [48 L Ed 575 1904)]); and *Weeks* [*supra*].

\* \* \*

We are impressed, however, that a careful consideration of the *Boyd Case* in connection with the *Adams Case* and the decisions of the State courts, some of which are cited above, but many of which are not, taken in the light of what was said by the court in the *Weeks Case*, demonstrates that in the main the United States Supreme Court and the courts of last resort of the various States are in accord, and that the *Boyd Case* does not conflict, as its critics claim, with the holdings of the many State courts. [*Marxhausen, supra* at 568, 571.]

11

however, that the states are free to impose higher standards on searches and seizures than the Fourth Amendment requires. *Cooper v California*, 386 US 58, 62; 87 S Ct 788; 17 L Ed 2d 730 (1967). Thus, the question arises whether Const 1963, art 1, § 11[6] provides more search and seizure protection than does its federal counterpart.

In interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical.[7] *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003). Conversely, we are free to interpret our Constitution consistent with the United States Supreme

---

[6] Const 1963, art 1, § 11 provides:

> The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.

[7] It is not necessary that the wording of our Constitution be different from that of the United States Constitution, however, in order for this Court to interpret our Constitution different from the United States Supreme Court's interpretation of the United States Constitution. *People v Smith*, 420 Mich 1, 7 n 2; 360 NW2d 841 (1984).

Court's interpretation of the United States Constitution unless a compelling reason precludes us from doing so. As this Court stated in *Sitz v Dep't of State Police,* 443 Mich 744, 758; 506 NW2d 209 (1993), however, a "'compelling reason' should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law." Rather, we must determine what law "'the people have made.'" *Id*. at 759, citing *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884). The following factors are relevant in determining whether a compelling reason exists to interpret the Michigan Constitution and the United States Constitution differently:

> 1) [T]he textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preëxisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest. [*People v Collins*, 438 Mich 8, 31 n 39; 475 NW2d 684 (1991).]

The above factors are also helpful in determining the intent of the ratifiers with respect to our state constitutional provisions.

In *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.), this Court examined the

13

circumstances surrounding the creation of Const 1963, art 1, § 11 to determine whether the provision provided a higher degree of search and seizure protection than the Fourth Amendment. See also *Sitz, supra* at 752-757. In *Nash*, this Court stated:

> The focus of the Michigan Constitutional Convention of 1961 was on the effect of *Mapp* on the third sentence of Const 1908, art 2, § 10.[8] The Committee on Declaration of Rights, Suffrage, and Elections proposed that the final sentence of Const 1908, art 2, § 10 be deleted in favor of the phrase "Evidence obtained in violation of this section shall not be used except as authorized by law." The committee reasoned that the broad holding of *Mapp* may have invalidated the final sentence of Const 1908, art 2, § 10. The merits of that sentence were also considered by the committee. The committee added the phrase "except as authorized by law" because:

---

[8] Const 1908, art 2, § 10 was the predecessor of Const 1963, art 1, § 11 and was "in effect the same provision found in the Fourth Amendment to the Federal Constitution." *Marxhausen, supra* at 562. In 1936, the people ratified an amendment of Const 1908, art 2, § 10 that added a third sentence commonly referred to as the "antiexclusionary clause." *Sitz, supra* at 753. That clause stated:

> Provided, however, That the provisions of this section shall not be construed to bar from evidence in any court of criminal jurisdiction, or in any criminal proceeding held before any magistrate or justice of the peace, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slungshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in the state. [*Id.* at 753-754.]

14

"Should the definition of the federal limits imposed on the States with respect to the admissibility of evidence change in the future, the Michigan Legislature and the Michigan courts could incorporate, in statute and court decisions, those rules with respect to the admissibility of evidence which reflect the opinion of the Legislature and the Michigan courts as to what ought to constitute sound practice in this State, subject only to the continuing recognition of the limits set by federal constitutional supremacy." Committee Proposals and Reports, Constitutional Convention 1961, Supporting Report, Committee Proposal No 15, pp 7, 10.

It therefore appears that the committee was attempting to allow for the possibility of a less stringent application of the exclusionary rule if allowed by federal law, rather than attempting to strengthen Michigan search and seizure protection.

The debates of the committee of the whole at the convention considered both the merits of, and the effect of *Mapp* on, Const 1908, art 2, § 10. See 1 Official Record, Constitutional Convention 1961, pp 464-484, 488-533, 674-688. The view that *Mapp* was limited to searches of dwellings and that a limitation on the exclusionary rule was proper on the merits carried the day. Attempts to unite Michigan and United States search and seizure law by adopting the exact language of the Fourth Amendment in the proposed Michigan Constitution were defeated. Instead, the anti-exclusionary-rule proviso of Const 1908, art 2, § 10 was amended back in to the proposed constitution. 1 Official Record, Constitutional Convention 1961, pp 531-688. Ultimately, language substantially similar to that of Const 1908, art 2, § 10, as amended, was adopted by the convention and recommended to the people.

The convention's address to the people stated that proposed Const 1963, art 1, § 11 was "No change from Sec. 10, Article II, of the

present constitution except for improvement in phraseology." 2 Official Record, Constitutional Convention 1961, pp 3364. Indeed, the common understanding of the people upon reading the proposed constitutional provision could be nothing but the belief that the search and seizure provision of the new constitution represented no change. There had been no substantive alterations. *There is no indication that in readopting the language of Const 1908, art 2, § 10 in Const 1963, art 1, § 11 the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed.* [*Nash, supra* at 211-213; quoted also at *Sitz, supra* at 754-756 (emphasis added).]

The *Nash* Court concluded:

Though the people of the State of Michigan have corrected this Court when they have believed it to have gone too far, the historical general power of this Court to construe the constitutional provision relating to searches and seizures has not been removed. The history of Const 1963, art 1, § 11, and its plain import, however, suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so. [*Nash, supra* at 214.]

Thus, it is clear from the records of the constitutional convention that the people favored less stringent search and seizure protections than required under the Fourth Amendment at that time. Approval of the antiexclusionary clause evidenced the people's intent to move away from the exclusionary rule of *Marxhausen* and *Mapp*

16

as a matter of state constitutional law and to restrict application of the judicially created remedy.

The text of Const 1963, art 1, § 11 itself is consistent with the above conclusion that the people intended to retreat from the exclusionary rule. Const 1963, art 1, § 11 provides:

> The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.

The antiexclusionary clause, i.e., the last sentence quoted above, precludes this Court from excluding from evidence any of the enumerated items. This clause does not constrain this Court's authority regarding items not specifically enumerated in the provision. In other words, the directive of the people that this Court may not exclude certain evidence does not require the exclusion of all other evidence. The antiexclusionary proviso should be viewed not as a ratification of the common-law exclusionary rule regarding items enumerated in the proviso, but, rather, as a restriction on this Court's authority to apply

the judge-made rule to those enumerated items. Because the proviso does not restrict this Court's authority regarding evidence not enumerated in the antiexclusionary clause, this Court remains free to repudiate or modify the exclusionary rule by virtue of the fact that it is a judicially created rule, not a constitutional rule.

Under the above authority, we are free to retain, modify, or retreat from the *Marxhausen* rule altogether. Because we find the reasoning of *Leon* persuasive, we choose to embrace *Leon* as a matter of our interpretive right under the common law and retreat from the judicially created exclusionary rule announced in *Marxhausen.* The goal of the exclusionary rule, as expressed in *Leon*, is to deter police misconduct. *Leon, supra* at 906-907; see also *People v Hawkins*, 468 Mich 488, 510-511; 668 NW2d 602 (2003); *People v Sobczak-Obetts*, 463 Mich 687, 711 n 19; 625 NW2d 764 (2001). Thus, the goal of the exclusionary rule would not be furthered where police officers act in objectively reasonable good-faith reliance on a search warrant.

Our dissenting colleagues rely on several pre-*Leon* cases in contending that deterring police misconduct is not the only purpose of the exclusionary rule. *Post* at 7. The United States Supreme Court in *Leon*, however, stated that "the exclusionary rule is designed to deter police

18

misconduct rather than to punish the errors of judges and magistrates." *Leon, supra* at 916. Further, the Court directed "that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918. Thus, in determining whether to apply the exclusionary rule, the proper focus is on the deterrent effect on law enforcement officers, if any. "If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments." *Id.* Thus, while the exclusionary rule may have had other purposes ascribed to it before *Leon*, the *Leon* Court effectively narrowed the focus of the rule as a remedy for police misconduct.

Further, the *Leon* Court rejected the notion that the exclusionary rule is an effective tool in remedying the errors of judges and magistrates and deterring violations of the Fourth Amendment generally:

> To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that

19

judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.

Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. Many of the factors that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. [*Leon, supra* at 916-917.]

The reasoning of *Leon* is persuasive. If judges and magistrates are "neutral and detached," the exclusion of evidence would have no deterrent effect on their practices. Because the exclusionary rule would not deter judicial errors, the purpose of the rule would not be served by requiring exclusion in all cases.[9]

---

[9] The dissent also criticizes our decision to depart from precedent by not following our decision in *People v Bloyd*, 416 Mich 538; 331 NW2d 447 (1982), *post* at 4, in which this Court declined to recognize a good-faith exception to the exclusionary rule. Our decision in *Bloyd*, however, predated *Leon* and declined to adopt a good-faith exception without any analysis of the issue.

(continued . . . .)

Neither the text of Const 1963, art 1, § 11 nor the history of the provision ascribes broader protections to our constitutional provision than the Fourth Amendment requires. In fact, examination of the 1961 Constitutional Convention reveals that the delegates favored a less stringent application of the exclusionary rule at that time, but felt constrained by *Mapp* to limit the antiexclusionary clause to searches occurring outside the curtilage of a dwelling. *Nash, supra* at 212-213. As this Court recognized in *Nash*, there is no indication that by adopting Const 1963, art 1, § 11 and adhering to the language of Const 1908, art 2, § 10, as amended, the people sought to place restrictions on law enforcement activity greater than those under the Fourth Amendment. "In fact,

---

Our dissenting colleagues further contend that our decision "forsake[s] [our] commitment to our citizens," "fail[s] to resist the lure of expediency," "discard[s] decades of sound analysis," and "treat[s] our Constitution as an impediment." *Post* at 1, 4, 10. The dissent fails to acknowledge, however, the very high cost of the exclusionary rule, including preventing the prosecutor's use of trustworthy evidence obtained in good-faith reliance on a search warrant because of a subsequently discovered technical defect in the warrant. See *Leon, supra* at 906-907. Excluding the use of such evidence impedes, rather than promotes, the truth-seeking function of the judiciary and thereby hinders public confidence in the integrity of the judicial process. While the dissent favors such a result, we believe that the high cost of the exclusionary rule exacts too great a toll on our justice system. See *Leon, supra* at 907-908, 922.

21

the contrary intent is expressed." *Id*. at 213. The intent of the delegates in 1961 is consistent with the United States Supreme Court's adoption of the good-faith exception in *Leon*, and the text of the Constitution is consistent with recognizing that exception. Because the exclusionary rule in Michigan is a judicially created, nonbinding rule, we interpret Const 1963, art 1, § 11 consistent with the *Leon* Court's interpretation of the Fourth Amendment and adopt the good-faith exception to the exclusionary rule in Michigan.[10]

---

[10] By adopting the good-faith exception to the exclusionary rule in Michigan, we are not overruling *Sitz*, which did not involve the scope of the exclusionary rule but which instead interpreted Const 1963, art 1, § 11 as affording greater *substantive* protection than does the Fourth Amendment in the context of automobile seizures. *Sitz, supra* at 776. Rather, we are overruling several Court of Appeals cases in which the Court declined to recognize a good-faith exception. See, e.g., *People v Hill*, 192 Mich App 54, 56; 480 NW2d 594 (1991); *People v Jackson*, 180 Mich App 339, 346; 446 NW2d 891 (1989).

The dissent notes that other jurisdictions have rejected the good-faith exception. See *post* at 4-5 n 2. While the manner in which other states have construed their respective constitutions and statutes is entirely irrelevant to our constitutional analysis, we note that numerous jurisdictions have adopted a good-faith exception. See e.g., *State v Eason*, 245 Wis 2d 206; 629 NW2d 625 (2001); *McDonald v State*, 347 Md 452; 701 A2d 675 (1997); *Ex parte Morgan*, 641 So 2d 840 (Ala, 1994); *Crayton v Commonwealth*, 846 SW2d 684 (Ky, 1992); *People v Camarella*, 54 Cal 3d 592; 286 Cal Rptr 780; 818 P2d 63 (1991); *Bernie v State*, 524 So 2d 988 (Fla, 1988); *State v Saiz*, 427 NW2d

(continued . . . .)

22

## C. Application of the good-faith exception in this case[11]

Applying the good-faith exception to the exclusionary rule in this case, we conclude that the circuit court erred by suppressing the marijuana, firearm, and firefighter paraphernalia. The police officers' reliance on the district judge's determination of probable cause and on the technical sufficiency of the search warrant was objectively reasonable. The information in the affidavit was not false or misleading, and the issuing judge did not "wholly abandon[]" her judicial role. See *Leon, supra* at 923. A review of the affidavit and search warrant can lead to no other logical conclusion than that the address listed was that of defendant.[12] Indeed, it probably did not even occur

---

825 (SD, 1988); *United States v Edelen*, 529 A2d 774 (DC App, 1987); *State v Wilmoth*, 22 Ohio St 3d 251; 490 NE2d 1236 (1986); *State v Ebey*, 491 So 2d 498 (La App, 1986); *State v Sweeney*, 701 SW2d 420 (Mo, 1985); *McCrary v Commonwealth*, 228 Va 219; 321 SE2d 637 (1984). Still other jurisdictions have adopted the good-faith exception to the exclusionary rule by statute, including Arizona (Ariz Rev Stat 13-3925), Colorado (Colo Rev Stat 16-3-308), Illinois (725 Ill Comp Stat 5/114-12(b)(1)), Indiana (Ind Code 35-37-4-5), and Texas (Tex Code Crim Proc art 38.23(b).

[11] The prosecutor concedes that the search warrant was not based on probable cause. Thus, the search and seizure was, in fact, unconstitutional.

[12] The dissent, *post* at 12-13 n 7, likens this case to *Groh v Ramirez*, 540 US ___ ; 124 S Ct 1284, 1290; 157 L Ed 2d 1068 (2004), in which the search warrant failed

(continued . . . .)

to the magistrate or executing officers that the address was not defendant's address. Further, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.*, quoting *Brown, supra*.

Although the warrant was later determined to be deficient, excluding the evidence recovered in good-faith reliance on the warrant would not further the purpose of the exclusionary rule, i.e., to deter police misconduct. Because the exclusionary rule should be employed on a case-by-case basis and only when exclusion would further the purpose of the rule, it should not be employed in this case.

## IV. CONCLUSION

We adopt the good-faith exception to the exclusionary rule in Michigan. The purpose of the rule, i.e., deterring

---

altogether to describe the "things to be seized." In that case, the United States Supreme Court stated that "even a cursory reading of the warrant . . . would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 1294. The search warrant in the instant case does not contain a "glaring deficiency" such as that present in *Groh*. Indeed, the warrant in *Groh* would not even apprise police officers of which items to seize, thereby impeding the very purpose of the search. As we have previously recognized, an examination of the warrant on which the officers relied in this case can lead to no logical conclusion other than that the premises to be searched belonged to defendant.

police misconduct, would not be served by applying the exclusionary rule in this case because the police officers' good-faith reliance on the search warrant was objectively reasonable. Thus, the officers committed no wrong that exclusion of the evidence would deter. Accordingly, we reverse the circuit court's ruling suppressing the evidence and remand for reinstatement of the charges against defendant.

> Maura D. Corrigan
> Elizabeth A. Weaver
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN

    Plaintiff-Appellant,

v                                                           No. 122364

GLENN GOLDSTON,

    Defendant-Appellee.

_____

MARKMAN, J. (*concurring*).

    I concur with the majority in its adoption of the good-faith exception to the exclusionary rule, an exception recognized by the United States Supreme Court. I write separately only in order to respond more fully to the dissent.

    Among myriad other shortcomings, the dissent accuses the majority of "fail[ing] to resist the lure of expediency," "forsak[ing] its commitment to our citizens," "discard[ing] decades of sound analysis," "contract[ing] citizen protections," and "treat[ing] our Constitution as an impediment."[1] *Post* at 1, 4, 5, 10. It must be

_____

[1] Further, the dissent characterizes this concurring opinion as a "diatribe," *post* at 15; as an "hysterical[]" argument, *post* at 15; and as somehow predicated upon its own "divine notion" of the Constitution's meaning. *Post* at

(continued . . . .)

understood that this overwrought language stands in support of the following proposition, which is found nowhere in either the Michigan Constitution or the United States Constitution, *to wit*, no matter how much good faith is demonstrated by the police in the conduct of a criminal investigation, no matter how slight an imperfection in such investigation,[2] no matter how serious the crime under investigation, and no matter how indispensable the evidence obtained during the investigation in determining the truth

19. What all the dissent's unrestrained language cannot obscure, however, is that it offers little in the way of response to the principal arguments set forth in the majority and concurring opinions: (1) an exclusionary rule without a good-faith exception is not mandated by either the United States Constitution or the Michigan Constitution; (2) the costs of an exclusionary rule without a good-faith exception are enormously high, while the benefits are virtually nonexistent; and (3) the exclusionary rule that has existed in the United States and in Michigan, unlike that preferred by the dissent, has always taken into consideration a balancing of costs and benefits.

One doubtlessly would search in vain over the past twenty-two years for similar language from other dissenting justices of this Court whose opposition to my dissenting colleague's criminal justice decisions, and whose opposition to the direction in which his decisions took this Court and the Michigan Constitution for many years, was no less deeply felt than that of my dissenting colleague.

[2] While the dissent asserts that the imperfection in this case is *not* slight, in truth, it is not relevant to the dissent whether it is slight or not because, under the dissent's view, *whatever* the magnitude of the imperfection, the evidence must be excluded.

2

of who perpetrated a crime, the prosecutor, in carrying out his responsibilities on behalf of the people of Michigan, must proceed to trial without that evidence. That is, the prosecutor must proceed to trial (if that is even possible after evidence has been excluded) as though the dead body in the basement did not exist, as though the illegal firearm under the sofa was never really there, and as though the incendiary materials in the garage were merely a figment of one's imagination, in the process requiring that a jury of defendant's peers—a jury comprised of twelve citizens brought together for the sole purpose of exercising their judgment and common sense in order to determine the truth of a criminal charge—render an accurate and just verdict while being deprived of what may well be the most relevant available evidence.

In urging such a justice system, the dissent also gives little consideration to the effect that decision-making by a blindfolded jury has upon public confidence in the integrity of a process viewed by the people, correctly, as indispensable in carrying out the first responsibility of government—the maintenance of what the Constitution of the United States describes as "domestic tranquility." The dissent's denunciation of the majority is in defense of a justice system in which *more* juries will be deprived of

3

*more* evidence, and, therefore, in which *more* juries will render *more* verdicts in which guilt or innocence is determined inaccurately. The dissent's denunciation is also in defense of a system in which *more* citizens serving on *more* juries will perform their civic obligation only to learn afterward, for the first time, that they have been deprived of access to facts and evidence that might have been determinative in their decisions. The attitude of these jurors, as well as the attitude of victims, witnesses, and the public, toward a system of justice in which the government's ability to carry out its responsibility of protecting the people from criminals is compromised by such a cavalier attitude toward evidence can only be imagined.

While the exclusion of evidence may, under exceptional circumstances, be constitutionally compelled, where it is not compelled—as the United States Supreme Court has determined to be the case where the police have carried out their responsibilities in good faith—it is hardly self-evident why the people of our State would wish to have more, rather than fewer, critical decisions of guilt or innocence decided by jurors who each has one of his hands tied behind his back. Evidence is the lifeblood of the

criminal justice process, and it is indispensable in ensuring fair and just determinations.

Concerning what furthers "citizen protections" under our Constitution, the dissent's dismissive conclusion that Michigan has "managed to exist for decades with the exclusionary rule and our streets have yet to become teeming with criminals released on 'technicalities,'" *post* at 14-15, belies that there *is* a real, but uncertain, number of criminals on our streets who have gone either unprosecuted, prosecuted on lesser charges, or unconvicted, because evidence has been withheld from a jury. That is an undeniable and logical reality of an exclusionary rule that pertains even to good-faith errors on the part of the police. While perhaps the extent to which our streets are or are not "teeming" with criminals who would have been incarcerated but for the absence of a good-faith exception cannot be precisely calculated, rates of violent crime have, in fact, grown enormously over recent decades.[3] Had

---

[3] The dissent is, of course, correct that crime rates do not uniformly proceed upward or downward. *Post* at 15 n 9. This point notwithstanding, violent crime rates in the United States, and in Michigan specifically, are far higher today than they were forty years ago. This can be confirmed by a cursory analysis of Bureau of Justice Statistics or FBI Uniform Crime figures. According to the latter, murder rates have grown by approximately 90%, forcible rape rates by 237%, aggravated assault rates by 240%, and overall violent crime rates by 144%. <http://

(continued . . . .)

5

our parents and grandparents, at the time of the inception

of an exclusionary rule in Michigan lacking a good-faith

exception, been able to look into their future and compared

levels of violent crime then and now, it is quite certain

that *they* would have viewed many of our streets today as

"teeming" with crime.  Doubtlessly, however, the people of

Michigan will continue to "manage to exist" at whatever

levels of crime are contributed to by individual criminal

justice decisions of the courts.[4]

---

www.disastercenter.com/crime/micrime.htm> (accessed July 9, 2004).

[4]  The dissent finds this discussion to be "hysterical[]," *post* at 15.  The dissent apparently wishes to have its cake and eat it as well, i.e., being allowed to criticize the majority for the damage that it allegedly is doing to the cause of constitutional government, while being immune itself from criticism for the consequences of its own position.  If, from the perspective of the dissent, the cost of the majority position is the loss of constitutional protections, from the perspective of the majority, the cost of the dissent's position is that, absent any constitutional imperative and absent any conceivable impact in deterring unconstitutional searches or seizures, the dissent's position would result in more violent offenders populating our streets.  Certainly, this is not a consequence that is intended or desired by the dissenting justices, but it nonetheless would be the inevitable consequence of their position.  There is no free lunch for the dissent.  It is entitled to argue its positions, but it is no more immune than the majority from accountability and responsibility for these positions. Further, it should be understood that the dissent does not dispute what this opinion asserts about the practical consequences of its far-reaching exclusionary rule; it merely responds that such assertions are "hysterical[]."

6

Despite the hyperbolic rhetoric of the dissent, the rights of criminal defendants have remained well-protected, both in the federal system and in those growing numbers of states in which the good-faith exception to the exclusionary rule has been adopted.[5] On the other hand, the rights of everyone else, and of society generally, have been *better* protected because the criminal justice system has been allowed to assess a defendant's guilt or innocence on the basis of the full range of relevant evidence. And, as a result, in some unknown, but very real, number of cases, criminal defendants, who, under the dissent's approach, would have been left on the streets to continue to prey upon their communities, have been convicted of

---

[5] Moreover, the rule advanced by the dissent, i.e., an exclusionary rule without a good-faith exception, by definition, could have no effect in deterring even a single improper search; all that this rule could do would be to afford a serendipitous windfall to an occasional guilty party by enabling such person to exclude reliable, inculpatory evidence from trial. "[A]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness." *Illinois v Gates*, 462 US 213, 257-258; 103 S Ct 2317; 76 L Ed 2d 527 (1983)(White J., concurring). The hard-to-understand calculus of the dissent's approach would be to deny the jury access to clearly probative and reliable evidence *without* any apparent countervailing benefit in deterring official lawlessness.

serious crimes on the basis of trustworthy evidence and after full due process of law.

The dissent asserts that it is "unclear how an allegedly increasing crime rate is relevant in determining our citizens' constitutional rights . . . ." *Post* at 15. That is, of course, neither my position nor that of the majority. Increasing crime rates have been cited only in response to the dissent's suggestions that there are no adverse consequences to its position and that Michigan has "managed to exist" despite the absence of a good-faith exception. More accurately, my position is that the absolutist exclusionary rule of the dissent's constitution, has little to do with the exclusionary rule of the constitutions that actually prevail in the United States and Michigan.

The dissent seems agitated that this concurrence would invoke such considerations as the impact of the dissent's rule upon crime, the absence of deterrent effect of the dissent's rule on police misconduct, and the adverse impact of the dissent's rule upon the integrity of the justice system. These considerations allegedly are in contrast to the dissent's more focused concern about the Constitution. The problem with this analysis is that the dissent's

8

constitution is not that of James Madison,[6] not that of the United States Supreme Court, and not that ratified by the people of Michigan. Rather, the United States Supreme Court has made clear that the exclusionary rule is of "quasi-constitutional" dimension and that its applicability in particular contexts is a function of a variety of pragmatic and balancing considerations.[7] While the dissent

---

[6] That the dissent's rule is not part of James Madison's Constitution is manifest by the absence of any mention in the Constitution of such a rule as well as by consistent early judicial practice. As summarized by one scholar:

> [S]earches of private premises generally required warrants. In all other circumstances, warrants were unnecessary. Any person, including a private citizen, acting on his own, could search and seize at his own peril. If the search uncovered contraband or property otherwise subject to forfeiture, then he was completely justified. If, however, the search proved fruitless, then the party who made the search was liable to damages unless he could find the shelter of a statute. A search conducted in good faith pursuant to statutory authority was considered reasonable. [Harris, *Back to basics: An examination of the exclusionary rule*, 37 Ark L R 646, 647 (1983).]

See also *Gelston v Hoyt*, 16 US 246; 4 L Ed 381 (1818); *Wood v United States*, 41 US 342; 10 L Ed 987 (1842).

[7] While, from the dissent's perspective, the majority's approach to interpreting the breadth of the exclusionary rule may seem "distinctive" or "idiosyncratic," *post* at 15-16 n 9, it is essentially indistinguishable from that of the United States Supreme Court in view of that Court's characterization of the rule as a uniquely "judicially created" remedy. *Pennsylvania Bd of Probation v Scott*, 524 US 357, 363; 118 S Ct 2014; 141 L Ed 2d 344 (1998).

is entitled to its view that the rule should be applied more broadly, and contain fewer exceptions, the dissent should not confuse its own views with those of either the United States Constitution or the Michigan Constitution.

Among other limitations on the exclusionary rule, the United States Supreme Court has concluded that the rule does not apply retroactively unlike most rules that are constitutional, *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965); the rule does not apply to those lacking standing, *Alderman v United States*, 394 US 165; 89 S Ct 961; 22 L Ed 2d 176 (1969); the rule does not apply to grand jury proceedings, *United States v Calandra*, 414 US 338; 94 S Ct 613; 38 L Ed 2d 561 (1974)*;* the rule does not apply to civil proceedings, *United States v Janis*, 428 US 433; 96 S Ct 3021; 49 L Ed 2d 1046 (1976); the rule does not apply to deportation proceedings, *Immigration & Naturalization Service v Lopez-Mendoza*, 468 US 1032; 104 S Ct 3479; 82 L Ed 2d 778 (1984)*;* the rule does not apply where the unlawfully seized evidence is used against a parolee in parole revocation hearings, *Pennsylvania Bd of Probation v Scott*, 524 US 357; 118 S Ct 2014; 141 L Ed 2d 344 (1998); the rule does not apply where evidence is used to impeach a defendant in a criminal proceeding, *James v Illinois*, 493 US 307; 110 S Ct 648; 107 L Ed 2d 676 (1990);

10

the rule does not apply in the context of habeas corpus relief where the state has provided an opportunity for full and fair litigation of the Fourth Amendment claim, *Stone v Powell*, 428 US 465; 96 S Ct 3037; 49 L Ed 2d 1067 (1976); the rule does not apply where the police have acted in objectively reasonable reliance upon a statute that is subsequently declared unconstitutional, *Illinois v Krull*, 480 US 340; 107 S Ct 1160; 94 L Ed 2d 364 (1987); the rule does not apply if the government can be said to have also discovered the evidence through independent means, *Silverthorne Lumber Co v United States*, 251 US 385; 40 S Ct 182; 64 L Ed 319 (1920); the rule does not apply if the connection between the illegality and the seizure has become so attenuated as to dissipate the taint, *Nardone v United States*, 308 US 338; 60 S Ct 266; 84 L Ed 307 (1939); the rule does not apply where the evidence would at some future time likely have been discovered, *Nix v Williams*, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984); the rule does not apply where the police have in good faith relied upon a defective warrant, *United States v Leon,* 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1984); *Massachusetts v Sheppard*, 468 US 981; 104 S Ct 3424; 82 L Ed 2d 737 (1984); and the rule does apply, even with respect to substantial and deliberate violations of the Fourth Amendment, only "in

the absence of a more efficacious sanction . . . ." *Franks v Delaware*, 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978).

"Neither [these] cases nor any others hold that anything which deters illegal searches is thereby commanded by the Fourth Amendment. The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman, supra* at 174-175.

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra, supra* at 348.

"In deciding whether to extend the exclusionary rule to grand jury proceedings, we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context.   It is evident that this extension of the exclusionary rule would seriously impede the grand jury." *Id*. at 349.

"Against this potential damage to the role and functions of the grand jury, we must weigh the benefits to be derived from this proposed extension of the exclusionary rule.   Suppression of the use of illegally seized evidence against the search victim in a criminal trial is thought to be an important method of effectuating the Fourth Amendment.   But it does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct."   *Id*. at 350.

"'Illegal conduct' is hardly sanctioned, nor are the foundations of the Republic imperiled, by declining to make an unprecedented extension of the exclusionary rule to grand jury proceedings where the rule's objectives would not be effectively served and where other important and historic values would be unduly prejudiced."   *Id*. at 355 n 11.

"[W]e conclude that exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion.  This Court, therefore, is not justified in so extending the exclusionary rule." *Janis*, *supra* at 454.

"'[It] will not do to forget that the [*Weeks*] rule is a rule arrived at only on the nicest balance of competing considerations and in view of the necessity of finding some effective judicial sanction to preserve the Constitution's search and seizure guarantees.  The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in '[exerting] general legal pressures to secure obedience to the Fourth Amendment on the part of federal law-enforcing officers.'  As it serves this function, the rule is a needed, but [grudgingly] taken, medicament; no more should be swallowed than is needed to combat the disease.  Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest as declared by Congress.'  Amsterdam,

Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 388-389 (1964)." *Janis, supra* at 454 n 29.

"[T]he policies behind the exclusionary rule are not absolute. Rather, they must be evaluated in light of competing policies." *Stone, supra* at 488.

"The answer is to be found by weighing the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims." *Id*. at 489.

"[T]he contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force." *Id*. at 494-495.

"In these circumstances we are persuaded that the *Janis* balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS." *Lopez-Mendoza, supra* at 1050.

"As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced. Thus, in various circumstances, the Court has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process." *Krull, supra* at 347.

"[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial social costs exacted by the exclusionary rule.' When we indulge in such weighing, we are convinced that applying the exclusionary rule in this context is unjustified." *Id*. at 352-353 (citation omitted).

"[B]ecause the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its 'substantial social costs.'" *Pennsylvania Bd of Probation, supra* at 363.[8]

It is for *these* reasons that there are a variety of considerations—extending far beyond those that the dissent would assess—that are fully relevant in determining whether the exclusionary rule is applicable in a particular instance, and that explain why the rule is not as broad or as absolute as the dissent would prefer.

Further, it must be recognized—and the majority opinion addresses this point, see *ante* at 14 n 8—that as

_____

[8] "The history of Const 1963, art 1, § 11, and its plain import, however, suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so." *People v Nash*, 418 Mich 196, 214; 341 NW2d 439 (1983).

far back as 1936, the Michigan Constitution exempted from the exclusionary rule "any narcotic drug or drugs, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slingshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in this state."[9] That is, the Michigan Constitution from 1936 until 1961, when *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), introduced a uniform national rule, imposed a limitation on the exclusionary rule that was considerably more restrictive than its federal counterpart. See, e.g., *People v Gonzales*, 356 Mich 247; 97 NW2d 16 (1959); *People v Winkle*, 358 Mich 551, 556; 100 NW2d 309 (1960).[10] Moreover, this relationship was sought to be continued by the 1963 constitution in which, two years after *Mapp*, its

---

[9] In 1936, the people ratified an amendment of Const 1908, art 2, § 10, which added the above language, now known as the anti-exclusionary clause.

[10] See also *People v Winterheld*, 359 Mich 467; 102 NW2d 201 (1960), which held that the exclusionary rule in Michigan does not preclude application of the so-called "silver platter" doctrine in which evidence, unlawfully seized in a foreign jurisdiction, can be utilized by Michigan police officers. "With respect to acts beyond its borders, by officers of another State, such guarantees do not extend to them and, hence, *the reason for the rule in that regard disappears* and, with it, the rule." *Id*. at 471 (emphasis added).

drafters again limited the reach of the exclusionary rule by inserting language substantially similar to that of Const 1908, art 2, § 10 (exempting from the exclusionary rule "any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state").

Thus, while the dissent cites the alleged "eighty year" period during which the exclusionary rule that it favors existed in unadulterated form in Michigan, *post* at 15, in truth the "heyday" of the exclusionary rule that the dissent recalls did not exist for at least a quarter-century preceding *Mapp*—because Michigan had substantially limited the scope of the rule in precisely those areas of criminal law in which it tends to be most regularly invoked—and it did not exist for many years afterward because the United States Supreme Court quickly made clear that the exclusionary rule was merely a judicially created, "prophylactic" remedy rather than a rule of absolute and invariable constitutional dimension.[11]

---

[11] See *Calandra, supra* at 348. It has consistently been the constitutional law of Michigan that the "search and seizure provision of the Michigan Constitution, Const 1963, art 1, § 11, affords defendant no greater rights upon which to support the suppression than the Fourth Amendment." *People v Chapman*, 425 Mich 245, 252-253; 387 NW2d 835 (1986). "[A]rt 1, § 11 is to be construed to provide the same protection as that secured by the Fourth

(continued . . . .)

The dissent purports to create a constitutional regime in Michigan in which it is able to pick and choose from among what it views as the "best" rules of particular eras, and combine them to create a constitutional regime that has existed in the real world for only brief moments. The dissent would combine an exclusionary rule that is broad in its coverage, failing to exclude "narcotic drugs, firearms, bombs, explosives [and] any other dangerous weapons," with an exclusionary rule that is narrow in its exceptions, most importantly lacking a good-faith exception. It is seriously misleading for the dissent to suggest that its position is a legitimate heir to "eighty years" of constitutional understanding in our state.

In summary, the dissent's constitution is one that would be unrecognizable to the framers of the United States

---

Amendment, absent 'compelling reason' to impose a different interpretation." *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991). "[T]he historical record clearly indicates that the people of Michigan had no intention of imposing more stringent restrictions upon law enforcement than is mandated by the Fourth Amendment." *Id*. at 32-33. "There is no compelling reason to interpret Const 1963, art 1, § 11 as affording greater protection for this defendant than is provided under the Fourth Amendment." *Id*. at 40. It is the dissent, not the majority, that is "ignor[ing] Michigan's history," *post* at 1, in failing to consider this statement of the traditional relationship between the Fourth Amendment of the United States Constitution and art 1, § 11 of the Michigan Constitution.

19

Constitution or the Michigan Constitution, as well as to generations of justices of both the United States Supreme Court and the Michigan Supreme Court. The dissent's constitution is one that ill-serves the interests of a responsible criminal justice system.[12] Given its lack of deterrent effect, the *only* consequence of the dissent's absolute exclusionary rule would be to raise an extraordinarily costly obstacle in the way of effective law enforcement.

                                        Stephen J. Markman

---

[12] Contrary to the dissent's intimations, the majority is not unconcerned about even good-faith imperfections in the investigative process. However, the issue before this Court is only whether *suppression of the evidence* is an appropriate remedy for a good-faith violation. There are far more appropriate and finely tuned remedies for violations of this kind, such as civil damages or tort claim remedies against the government. One of the virtues of enacting such alternative remedies is that they would compensate not only persons with respect to whom evidence of a crime has been discovered, but also those with respect to whom no such evidence has been discovered but who have nonetheless been the victims of Fourth Amendment violations. By contrast, the exclusionary rule accords benefit only to those with respect to whom evidence of a crime has been discovered.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                                          No. 122364

GLENN GOLDSTON,

    Defendant-Appellee.

_____

CAVANAGH, J. *(dissenting)*.

"[T]he task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our commitment to protecting individual liberty and privacy." *United States v Leon*, 468 US 897, 929-930; 104 S Ct 3405; 82 L Ed 2d 677 (1984) (Brennan, J., dissenting).  Today, the majority has chosen to ignore Michigan's history of protecting our citizens against unreasonable searches.  As a result, in choosing to adopt the good-faith exception to the exclusionary rule, the majority has forsaken its commitment to our citizens and failed to resist the lure of expediency.  Therefore, I must respectfully dissent.

The majority claims that there is no compelling reason for Michigan to provide greater protection against

unreasonable searches than that provided by the federal constitution.[1]  I disagree with the majority that Michigan must have a compelling reason to provide greater protection to our citizens than that provided by the federal constitution.  Instead, I believe this Court should be required to show a compelling reason to depart from past precedent.  See *People v Collins*, 438 Mich 8, 50; 475 NW2d 684 (1991) (Cavanagh, C.J., dissenting).  However, even if this Court must demonstrate a compelling reason to offer greater protection to our citizens, Michigan's jurisprudential history certainly meets this test.

Over forty years before the United States Supreme Court extended the exclusionary rule to the states in *Mapp*

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV.

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures.  No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state."  Const 1963, art 1, § 11.

*v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), Michigan adopted the exclusionary rule in *People v Marxhausen*, 204 Mich 559, 573-574; 171 NW 557 (1919). "[T]his Court created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor." *People v Nash*, 418 Mich 196, 214; 341 NW2d 439 (1983) (opinion of Brickley, J.). In *Marxhausen, supra* at 563, this Court wisely stated that it is "the essence of a free government that the individual shall be secure in his person, his home and his property from unlawful invasion, from unlawful search, from unlawful seizure."

This Court further articulated the importance of the exclusionary rule in *People v Halveksz*, 215 Mich 136, 138; 183 NW 752 (1921).

> Under a government of laws the security afforded persons, houses and possessions against search without a warrant, lawfully obtained, must not be violated by officers of the law. The law must point the way to legitimate search and seizure and will tolerate none other. Officers of the law must act within the law and if they invade the security guaranteed individuals by the Constitution, such invasion cannot bring to the aid of justice the fruit of their violation. It is the duty of courts, when attention is seasonably called to a violation of a constitutional right, in obtaining evidence in criminal prosecutions, to vindicate the protection afforded individuals by the Constitution, and to suppress such evidence. [*Id.*]

3

The compelling reason test "should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law." *Sitz v Dep't of State Police*, 443 Mich 744, 758; 506 NW2d 209 (1993). The majority's application of the compelling reason test disregards this, however, and ignores the jurisprudential history of the exclusionary rule in this Court. Those who have come before us have dedicated themselves to upholding Michigan's Constitution and providing reasoned analysis. Not only did this Court adopt the exclusionary rule before being required to do so, it also *declined* to recognize a good-faith exception to the exclusionary rule in *People v Bloyd*, 416 Mich 538, 556; 331 NW2d 447 (1982). Our state is not obligated to discard decades of sound analysis and reasoned jurisprudence merely because the United State Supreme Court has announced a decision limiting citizens' federal constitutional rights contrary to Michigan jurisprudence.[2] This Court is "not

---

[2] Other jurisdictions have also rejected the good-faith exception on state constitutional or statutory grounds. See, e.g., *State v Lacasella*, 313 Mont 185, 194; 60 P3d 975 (2002); *Dorsey v State*, 761 A2d 807, 817, 820 (Del, 2000) ("Without a constitutional remedy, a Delaware 'constitutional right' is an oxymoron that could unravel the entire fabric of protections in Delaware's two hundred and twenty-five year old Declaration of Rights."); *Harvey v State*, 266 Ga 671, 672; 469 SE2d 176 (1996); *State v*

(continued . . . .)

4

obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so." *Sitz, supra* at 763. Our state is free to provide more protections to its citizens than the United States Constitution does. This Court's adoption of the exclusionary rule decades before being required to do so, and its subsequent decision not to adopt a good-faith exception, is more than sufficient to qualify as a compelling reason.

---

*Canelo*, 139 NH 376, 382-383; 653 A2d 1097 (1995); *State v Gutierrez*, 116 NM 431, 446-447; 863 P2d 1052 (1993) ("Denying the government the fruits of unconstitutional conduct at trial best effectuates the constitutional proscription of unreasonable searches and seizures by preserving the rights of the accused to the same extent as if the government's officers had stayed within the law."); *State v Guzman*, 122 Idaho 981, 989, 998; 842 P2d 660 (1992); *Commonwealth v Edmunds*, 526 Pa 374, 397-398, 402; 586 A2d 887 (1991); *State v Oakes*, 157 Vt 171, 173; 598 A2d 119 (1991); *State v Marsala*, 216 Conn 150, 151; 579 A2d 58 (1990); *State v Carter*, 322 NC 709, 710, 719-720; 370 SE2d 553 (1988) (The exclusionary rule is necessary "for the sake of maintaining the integrity of the judicial branch of government."); *State v Novembrino*, 105 NJ 95, 153, 156-159; 519 A2d 820 (1987) ("By eliminating any cost for noncompliance with the constitutional requirement of probable cause, the good-faith exception assures us that the constitutional standard will be diluted."); *State v McKnight*, 291 SC 110, 114; 352 SE2d 471 (1987); *Commonwealth v Upton*, 394 Mass 363, 365-366; 476 NE2d 548 (1985); *People v Bigelow*, 66 NY2d 417, 422-423; 488 NE2d 451 (1985).

5

Notably, those who framed and adopted the Constitution were concerned about expanding the protection under Michigan's search and seizure provision beyond that of the federal constitution as it was interpreted in 1963. *Collins, supra* at 475; see also *Nash*, *supra* at 214. In 1963, the United States Supreme Court had adopted the exclusionary rule, but had not yet adopted the good-faith exception. Therefore, the 1963 ratification of our Constitution cannot support the notion that our citizens sought to have Michigan's Constitution adopt the good-faith exception as contained in the federal constitution, when it would be over twenty years before this exception was indeed recognized under the federal constitution. "[W]e may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn . . . such protection." *Sitz*, *supra* at 759. Unless the ratifiers were prescient, they could not know how the United State Supreme Court might interpret the federal constitution in future years. Therefore, it is illogical to claim that the 1963 ratification essentially foreclosed an interpretation of our Constitution that differs from that of the federal constitution.

Remarkably, the majority claims that the only purpose of the exclusionary rule is to deter police misconduct.

That claim is incomplete and ignores the other well-documented purpose of the exclusionary rule.  The United States Supreme Court has stated that the *purposes* of the exclusionary rule are to protect a person's Fourth Amendment guarantees by deterring lawless conduct by police officers *and* to close the courthouse doors "to any use of evidence unconstitutionally obtained." *Wong Sun v United States*, 371 US 471, 486; 83 S Ct 407; 9 L Ed 2d 441 (1963); see also *Brown v Illinois*, 422 US 590, 599; 95 S Ct 2254; 45 L Ed 2d 416 (1975); *Terry v Ohio*, 392 US 1, 12-13; 88 S Ct 1868; 20 L Ed 2d 889 (1968) (The exclusionary rule serves to deter police misconduct *and* preserve judicial integrity.); *Elkins v United States*, 364 US 206, 222; 80 S Ct 1437; 4 L Ed 2d 1669 (1960).[3]

---

[3] While the United States Supreme Court, after its *Leon* decision, has primarily focused on the deterrence of police misconduct in justifying the good-faith exception, it has not failed to recognize that other purposes still exist. In *Illinois v Krull*, 480 US 340, 347; 107 S Ct 1160; 94 L Ed 2d 364 (1987), the Court refers to police deterrence as the "'prime purpose' of the exclusionary rule," but it does not state that it is the sole purpose.  (Citation omitted.) While discussing the deterrent effects of the exclusionary rule in *James v Illinois*, 493 US 307, 314; 110 S Ct 648; 107 L Ed 2d 676 (1990), the Court refers to the *purposes* of the exclusionary rule.  See also *Colorado v Connelly*, 479 US 157, 169; 107 S Ct 515; 93 L Ed 2d 473 (1986) (the exclusionary rule is aimed at deterring lawless conduct by the police *and* the prosecutor).

(continued . . . .)

"Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." *Terry*, *supra* at 13. The exclusionary rule "is directed at *all* unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits." *Brown*, *supra* at 601 (emphasis added). In *Mapp*, *supra* at 648, the United States Supreme Court quoted *Weeks v United States*, 232 US 383, 393; 34 S Ct 341; 58 L Ed 652 (1914), as follows:

> "If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great

Even if one were to assume that the United States Supreme Court has abandoned the concerns it expressed in *Mapp, supra* at 659, about ensuring and maintaining judicial integrity, I cannot agree that those concerns should be abandoned. As stated in *Mapp*, *supra* at 659, "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." And as Justice Stevens stated in his dissent in *Arizona v Evans*, 514 US 1, 18; 115 S Ct 1185; 131 L Ed 2d 34 (1995), "The [Fourth] Amendment is a constraint on the power of the sovereign, not merely on some of its agents."

> principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

As Justice Scalia also recently wrote in *Crawford v Washington*, 541 US ___; 124 S Ct 1354, 1373; 158 L Ed 2d 177 (2004), the framers of the United States Constitution "knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people . . . ."[4]

Without the exclusionary rule, the assurance against unreasonable searches and seizures would be "valueless and undeserving of mention in a perpetual charter of inestimable human liberties . . . ." *Mapp*, *supra* at 655. The Constitution exists to protect us all. Hundreds of years ago, our founders had the wisdom to recognize that our government must be held to the highest standards.[5] It

---

[4] While *Crawford* dealt with the Confrontation Clause, Justice Scalia's words are most fitting in this case as well.

[5] In 1761, James Otis argued against the general writs of assistance that allowed the British government to search homes at any time of the day or night. Otis argued that only special warrants, in which the complainant swore that he suspected goods were located in a specific place, were valid. The concern with writs of assistance is that "[a] man is accountable to no person for his doings." James Otis, oral argument, Superior Court of Massachusetts, February 24, 1761, <http://douglasarchives.org/otis_a34.htm> (accessed February 27, 2004). Unfortunately, almost

(continued . . . .)

must be accountable to the people, for without the people, government has no reason to exist.

In today's decision, the majority treats our Constitution as an impediment that courts must maneuver around for the justice system to work. This is evident in its zeal to adopt the good-faith exception in this case when the search warrant at issue does not come close to meeting the standards articulated in *Leon*. "Probable cause to issue a search warrant exists where there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place."[6] *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). *Leon*, *supra* at 914-915, 926, held that the good-faith exception does not apply if the magistrate abandoned his detached and neutral role, the police officers were dishonest or reckless, or the police officers could not have had an objectively reasonable belief that probable cause existed.

This is not a case where there was a mere typographical error that was not discovered until after the

---

250 years later, this same issue, albeit it in a slightly different form, plagues us yet again.

[6] The majority, of course, to even get to *Leon*, concedes the finding of lack of probable cause.

10

warrant was carried out.  See, e.g., *Arizona v Evans*, 514 US 1, 15-16; 115 S Ct 1185; 131 L Ed 2d 34 (1995) (a police officer acted on incorrect computer data entered by a court clerk).  And this is certainly not a case where there was a close call about the sufficiency of an affidavit.  See, e.g., *Leon*, *supra* at 904.  We concur in the findings of the trial court, which stated:

> In order for the warrant to be sustained the observations were made of a recent nature.  Examination of the affidavit in support of a warrant, a search warrant, dues [sic, does] nothing to enlighten anyone.  It obtains no reference as to when these contacts between Officer Born and the defendant were had, was not able to tell how close in time the contacts were with respect to defendant's alleged activities posing as a firefighter, how close the time those activities were to the date of the affidavit for the warrant.
>
> Also looking at the affidavit, I don't find anything in the affidavit connecting the location of the dwelling, 29440 Hazelwood, Inkster, Michigan, to this defendant for any information stating why there is a request to search this location.
>
> It doesn't have to be the defendant's residence but there has to be, in this Court's judgment, something connecting the defendant to the location that was searched.
>
> Whether it was somewhere he worked, whether it was somewhere he was seen going in and out of.  Whether it was somewhere he lived, or someone saw him going into after the incident, was it his girlfriend or him being associated in some manner with that location.

11

And on the face of the affidavit I don't find anything connecting the defendant to that location that was searched.

So therefore based on those findings by the Court, I'm going to grant the motion. I don't think that the affidavit sufficiently established the probable cause necessary so that the magistrate could properly have issued the warrant. So the motion is granted.

This is a case in which the affidavit offered *absolutely no* information linking defendant to the address on the warrant. It was not objectively reasonable for the police officers to have relied on a warrant that did not provide *any* information connecting defendant with the place to be searched. The majority pointedly states that the information provided was not false or misleading. And I agree, but that is only because it is impossible for one to find *nonexistent* information false or misleading.[7]

---

[7] Remarkably, the majority refers to violating our Constitution's probable cause requirement, and therefore our citizens' constitutional rights, as a "technical defect." *Ante* at 21 n 9. I disagree. In this case, conducting a search based on a warrant that does not establish *any* connection between the place to be searched and a defendant is not merely a technical violation. As the United States Supreme Court recently held, when a warrant does not describe the items to be seized *at all*, the warrant was so obviously deficient that the search is regarded as warrantless. *Groh v Ramirez*, 540 US ___; 124 S Ct 1284, 1290; 157 L Ed 2d 1068 (2004). It was unreasonable for a law enforcement officer to rely on a warrant "so patently defective." *Id*. at 1292. "[E]ven a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that

(continued . . . .)

12

The good-faith exception is premised on the belief that the law enforcement officer was "'acting as a reasonable officer would and should act in similar circumstances.'" *Leon*, *supra* at 920, quoting *Stone v Powell*, 428 US 465, 539-540; 96 S Ct 3037; 49 L Ed 2d 1067 (1976)(White, J., dissenting). *Leon* even states, "We emphasize that the standard of reasonableness we adopt is an objective one. . . . The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits." *Id*. at 920 n 20.

Unlike the majority, I give our trained law enforcement officers more credit, and I believe law enforcement officers know that when submitting an affidavit in support of the issuance of a search warrant they must include *why* they believe the area should be searched. Because of the lack of any information linking defendant to

---

any reasonable police officer would have known was constitutionally fatal." *Id*. at 1294. Likewise, an affidavit that provides no information linking a defendant to the address to be searched, like the affidavit in this case, is also a glaring deficiency that would be evident to any reasonable law enforcement officer. While *Groh* dealt with qualified immunity, the Court used the same standard of objective reasonableness articulated in *Leon*.

13

the place to be searched, even under the *Leon* good-faith exception, this warrant is insufficient.[8]

Further, the magistrate in this case did not review the affidavit for issuance of a search warrant with neutral and detached scrutiny. *Id*. at 913-914. The magistrate authorized a search warrant that provided no information linking the address with defendant. A neutral and detached magistrate would have directed the police officers to provide information linking the address to be searched with defendant. There is simply no fact indicating a connection between the address and defendant. There is no other term for the magistrate's approval in this case other than to describe it as being a "rubber stamp for the police." *Id*. at 914.

The majority also argues "that the high cost of the exclusionary rule exacts too great a toll on our justice system." *Ante* at 21 n 9. The exclusionary rule, grounded in our Constitution, has been the rule of law in Michigan for over eighty years. While it may be obvious, I note that our state has managed to exist for decades with the

---

[8] See, e.g., *Figert v State*, 686 NE2d 827, 832 (Ind, 1997) (the good-faith exception does not apply when the affidavit does not sufficiently link the home to be searched to criminal activity).

14

exclusionary rule and our streets have yet to become teeming with criminals released on "technicalities."

Finally, I am somewhat heartened by the fact that the ever-sensitive concurrence has seen fit to attack my dissent with a lengthy diatribe championing law and order. I also applaud the concurrence's ability to vigorously criticize the dissent for its "overwrought language" and "hyperbolic rhetoric," yet still manage to hysterically argue that the dissent's approach leaves criminal defendants "on the streets to continue to prey upon their communities . . . ." *Ante* at 1, 7. While I am unclear how an allegedly increased crime rate is relevant in determining our citizens' constitutional rights, it is quite a marvel to watch the concurrence criticize the dissent for attempting to protect our citizens' constitutional liberties.[9]  At its core, the concurrence

---

[9] Notably, crime rates have actually been going *down*. See, e.g.,<http://www.ojp.usdoj.gov> and <http://www.fbi.gov> (accessed February 27, 2004).  If crime rates are to be considered in constitutional interpretation, as the concurrence indicates, then the falling rates should give the concurrence pause.  Perhaps the concurrence will change its notion if the rates continue to fall.  Or, if the rates unfortunately increase, the concurrence may argue for a greater contraction of constitutional liberties.  Either way, the concurrence's idiosyncratic method of constitutional interpretation is certainly unique.

(continued . . . .)

clearly indicates the fundamental difference between my view of our citizens' constitutional liberties and the majority and concurrence's views. I believe that the Constitution exists to protect *all* citizens, and the Bill of Rights, the first ten amendments, to protect all citizens from unlawful acts by the government. I do not believe that requiring the government to follow the law, while attempting to catch those who are allegedly breaking it, is a radical notion so easily dismissed. If, as the concurrence advocates, "[e]vidence is the lifeblood of the criminal justice process," *ante* at 4, then I believe that the Constitution is the lifeblood of our democracy, and I do not agree with attempts to violate it.

The concurrence argues that the exclusionary rule has no effect in deterring even a single improper search. It

---

The concurrence's distinctive ideas about constitutional interpretation also extend to its recitation of numerous federal cases dealing with the exclusionary rule in various settings, such as deportation proceedings. In citing the "balancing test" from *United States v Janis*, 428 US 433, 454; 96 S Ct 3021; 49 L Ed 2d 1046 (1976), the concurrence apparently believes that the more law enforcement officers disregard the exclusionary rule, the less effective it is. Therefore, the lack of a deterrent effect justifies the violation of citizens' constitutional rights. This very notion—that the government's disregard of constitutional rights justifies the government's *continued and increased* disregard of constitutional rights— appears contrary to logic and, of course, our nation's history.

is disingenuous to argue that the actions of law enforcement officers will not be influenced by the knowledge that even "mistakes" that violate a citizen's constitutional rights are still admissible in a court of law. The facts of this case indicate that the majority and concurrence are willing to classify almost any conduct as a "mistake." The concurrence even goes so far as to rename these constitutional violations "good-faith imperfections." *Ante* at 19 n 7.[10] It is hard to take the arguments of the majority and concurrence seriously when they argue, as they do in this case, that a reasonable law enforcement officer would make the "mistake" of submitting an affidavit in support of a search warrant that provides *no link* between the defendant and the place to be searched.

The majority and concurrence also argue that excluding evidence seized in violation of our Constitution hinders public confidence. I have much more faith in the people of our state. I believe that public confidence is shattered by a government that does not respect the constitutional

---

[10] The concurrence also argues that people whose constitutional rights have been violated could pursue a civil damages lawsuit. However, governmental immunity will preclude the *vast* majority of these lawsuits and, therefore, it is not a realistic remedy. See, e.g., MCL 691.1401 *et seq.*

rights of its citizens. I believe the citizens of our state understand that the Constitution protects us all and that they do not have to make a choice between constitutional liberties and justice. I believe our citizens expect the government to follow the law, just as they are required to do. No matter how "indispensable" evidence may be, law enforcement officers are not given a free pass merely because they are cloaked with governmental authority. The concurrence indicates its belief that our citizens' constitutional liberties should be discarded because it will make us "safer." What a peculiar notion. Contrary to the concurrence, I agree with the following values, stated so eloquently by Justice Brandeis in his dissenting opinion in *Olmstead v United States*, 277 US 438, 485; 48 S Ct 564; 72 L Ed 944 (1928):

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious

doctrine this Court should resolutely set its face.

In the future, I am confident that history will show that the tactics used by the concurrence are flawed ones. Our citizens' concerns about safety should not be exploited because the concurrence believes that it has some divine notion about the Constitution's meaning. If the Constitution truly means what the concurrence argues, then crime rates and public confidence have nothing to do with the analysis. The concurrence claims that the "the dissent's constitution is one that would be unrecognizable to the framers of the United States Constitution or the Michigan Constitution, as well as to generations of justices . . . ." *Ante* at 19-20. I believe what would be unrecognizable to the framers and past generations of justices would be the majority and concurrence's insistence on discarding the rights of our citizens for their new version of a law and order society that *these justices* have decided is best for the people. Our decisions are our legacy. History will be our judge, and I welcome its review.

When our government violates our citizens' constitutional rights, it should find no refuge in our courts. Today, the majority disregards decades of reasoned

and sound jurisprudence by this Court protecting our citizens against unreasonable searches. Therefore, I respectfully dissent.

                              Michael F. Cavanagh
                              Marilyn Kelly